# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NORLIN JONES,<br><br>*Plaintiff*,<br><br>v.<br><br>TENNESSEE HOUSING DEVELOPMENT AGENCY (THDA); RALPH PERREY, in his official capacity as Executive Director of THDA; LINDSAY HALL, in her official capacity as Chief Operating Officer of Single Family Programs at THDA; RICK NEAL, in his official capacity as Chair of THDA's Board of Directors; STEPHEN DIXON, in his official capacity as Vice Chair of THDA's Board of Directors; COREY DIVEL, in his official capacity as a member of THDA's Board of Directors; JIM BRYSON, in his official capacity as a member of THDA's Board of Directors; TRE HARGETT, in his official capacity as Tennessee Secretary of State and a member of THDA's Board of Directors; MAEGHAN JONES, in her official capacity as a member of THDA's Board of Directors; DAVID LILLARD, in his official capacity as Tennessee State Treasurer and a member of THDA's Board of Directors; MICHAEL A. MILLER, in his official capacity as a member of THDA's Board of Directors; ROB MITCHELL, in his official capacity as Deputy Counsel to the Governor and a member of THDA's Board of Directors; JASON E. MUMPOWER, in his official capacity as Tennessee Comptroller of the Treasury and a member of THDA's Board of Directors; HANCEN SALE, in his official capacity as a member of THDA's Board of Directors; EVA ROMERO, in her official capacity as a member of THDA's Board of Directors; and DAN SPRINGER, in his official capacity as a member of THDA's Board of Directors,<br><br>*Defendants*. | **Complaint – Class Action**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

As Tennessee Attorney General Jonathan Skrmetti has said: "Americans fought for generations to ensure that people would not be treated differently because of the color of their skin . . . . No American should be deprived of an opportunity because of their race." Jonathan Skrmetti, Tennessee Attorney General & Reporter, TN AG Pushes Back on Unlawful DEI Federal Regulation (Mar. 19, 2024), https://perma.cc/E7PP-XVER.

But apparently the goose and gander live by completely different rules. While threatening Fortune 100 companies and the American Bar Association for racial discrimination, the State of Tennessee believes it can dole out tens of millions of dollars in federal COVID-19 relief solely on the basis of race.

Plaintiff Norlin Jones brings this action for damages and declaratory and injunctive relief on behalf of himself and a Class of other Tennessee homeowners who were similarly discriminated against based on the color of their skin. Plaintiff brings this case against the following Defendants, who are responsible for carrying out an unconstitutional, race-based social agenda: Tennessee Housing Development Agency (THDA); Ralph Perrey, in his official capacity as Executive Director of THDA; Lindsay Hall, in her official capacity as Chief Operating Officer of Single Family Programs at THDA; Rick Neal, in his official capacity as Chair of THDA's Board of Directors; Stephen Dixon, in his official capacity as Vice Chair of THDA's Board of Directors; Corey Divel, in his official capacity as a member of THDA's Board of Directors; Jim Bryson, in his official capacity as a member of THDA's Board of Directors; Tre Hargett, in his official capacity as Tennessee Secretary of State and a member of THDA's Board of Directors; Maeghan Jones, in her official capacity as member of THDA's Board of Directors; David Lillard, in his official capacity as Tennessee State Treasurer and a member of THDA's Board of Directors; Michael A. Miller, in his official capacity as a member of THDA's Board of Directors; Rob Mitchell, in his official

capacity as Deputy Counsel to the Governor and a member of THDA's Board of Directors; Jason E. Mumpower, in his official capacity as Tennessee Comptroller of the Treasury and a member of THDA's Board of Directors; Hancen Sale, in his official capacity as a member of THDA's Board of Directors; Eva Romero, in her official capacity as a member of THDA's Board of Directors; and Dan Springer, in his official capacity as a member of THDA's Board of Directors (collectively "THDA").[1]

THDA decided that it wanted to prioritize housing relief funds to homeowners of its preferred racial and ethnic groups. And to accomplish that goal, it designed its Tennessee Homeowner Assistance Fund program, conducted direct outreach and marketing about its program, and administered its program all on the basis of race to direct funds to minority homeowners and away from white homeowners. THDA's discrimination in the provision of COVID-19 relief funds violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth in this Complaint, Plaintiff and the proposed Class are entitled to damages, a declaratory judgment, and injunctive relief.

## INTRODUCTION

1.     THDA has systematically discriminated and continues to discriminate against white homeowners when providing COVID-19 relief. THDA intentionally created and administered its Tennessee Homeowner Assistance Fund program to prioritize financial relief to homeowners of its preferred racial and ethnic groups at the expense of white homeowners. THDA administered a program that prioritized the distribution of federal funds to "socially disadvantaged individuals," a term for which it could set its own definition. It then defined "socially disadvantaged individuals"

---

[1] For ease of reference, Defendants are collectively referred to as "THDA" throughout the Complaint unless otherwise noted.

to mean homeowners that identified as "a minority race or ethnicity." THDA, TNHAF Homeowner Assistance Fund at 6, https://perma.cc/PQW2-PSFC ("Plan Narrative"). It then operated a scheme to provide more federal funds to those homeowners over white homeowners. To accomplish this scheme, THDA carefully studied the racial makeup of homeowners within the state and created and implemented a targeted outreach and marketing plan to reach minority homeowners at the expense of white homeowners through practices such as mortgage servicer outreach, community events, outreach through race-based community groups and housing counseling agencies, and geographically targeted advertising. Once it teed up applications from its preferred homeowners through its outreach scheme, THDA assisted minority homeowners with the application process and prioritized application review and granting funding awards to minority applicants. THDA's scheme was successful: The agency achieved the equity it sought. Out of the approved applications, precisely 49% of the homeowners were black and 49% were white, Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q3, 2024, https://perma.cc/U8MC-SFWX, even though, according to THDA's own analysis, only 10.5% of Tennessee owner-occupied households are black and 86.4% are white, Plan Narrative at 6. THDA's race-based scheme violates Title VI and the Equal Protection Clause and harmed white homeowners like Plaintiff throughout Tennessee.

2.      As a result of THDA's racial discrimination, white homeowners (including Plaintiff) who struggled with the economic consequences of the COVID-19 pandemic lost out on financial assistance they needed to help pay their mortgages. For example, Plaintiff Norlin Jones lost significant income after his hours at a manufacturing plant were cut due to the pandemic. But due to THDA's discriminatory targeted outreach and racially directed marketing about its Tennessee Homeowner Assistance Fund program, Plaintiff Jones never heard about the program and was

denied the equal opportunity to apply for assistance and the ability to receive much needed financial assistance. Plaintiff Jones—and many other Tennessee homeowners like him—needlessly suffered financial hardships because of THDA's race-based social agenda.

3.      There is no justification for THDA's racial discrimination. THDA could have administered its program in a race-neutral way. Instead, it discriminated (and continues to discriminate) against white homeowners in favor of homeowners from preferred racial and ethnic groups. But COVID-19 did not discriminate. THDA homeowners of all races needed and continue to need assistance.

4.      THDA's racial discrimination is plainly unlawful. The Supreme Court has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) ("*SFFA*") (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). When the government treats citizens differently based on race, "it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

5.      Plaintiff and the Class are entitled to damages and declaratory and injunctive relief under Title VI and the Equal Protection Clause.

### JURISDICTION & VENUE

6.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7.      This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Tennessee.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b) under LR 3.3(b) because at least one Defendant is a resident of this District, all Defendants are residents of Tennessee, and

a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Venue is also proper in this District under 28 U.S.C. § 1391(c)(2) because Defendant THDA is an entity with the capacity to sue and be sued, T.C.A. § 13-23-115(24), and is subject to the Court's personal jurisdiction with respect to the civil action in question.

**PARTIES**

9. Plaintiff Norlin Jones is a resident of Tennessee.

10. Defendant Tennessee Housing Development Agency (THDA) is "a body, politic and corporate" and "political subdivision and instrumentality of the state," T.C.A. § 13-23-104, that was created by the General Assembly in 1973 as the state's housing finance agency, *see* T.C.A. § 13-23-101; THDA, About Us, https://perma.cc/5W5H-KN7G ("THDA, About Us"). THDA is governed by a board of directors. T.C.A. § 13-23-105. Five of the board members are state officials, *id.* § 13-23-106, six are appointed by the Governor, *id.* § 13-23-107(a)(1), one is appointed by the Speaker of the State Senate, *id.* § 13-23-107(a)(2), and one is appointed by the Speaker of the House of Representatives, *id.* THDA has the power to, among other things, "[s]ue and be sued in its own name, plead and be impleaded," "[m]ake, enter into and enforce all contracts or agree-ments," "[a]cquire real property," "[m]ake . . . loans," and "[a]dopt bylaws for the regulation of its affairs and the conduct of its business and prescribe rules, regulations and policies in connection with the performance of its functions and duties." *Id.* § 13-23-115(1)-(3), (7), (13), (24), (27). THDA is primarily self-funded through issuance of bonds and notes to raise capital from private investors. *See id.* § 13-23-102 (THDA "is given the power to raise funds from private investors through issuance of its bonds and notes and to use such funds, together with investment income, and moneys from other public and private sources"). And THDA generates its own "[a]vailable operating revenues" from (1) "all amounts received on account of mortgages acquired or loans made by the agency," (2) "fees charged by the agency," and (3) "income or interest earned or added

to funds of the agency due to the investment thereof." *Id.* § 13-23-122(f)(1). THDA is also financially liable for its own debts. *Id.* § 13-23-124(a)(1) ("Obligations issued under this part shall not be deemed to constitute a debt, liability, or obligation of the state or of any other political subdivision thereof, nor a pledge of the full faith and credit of the state or any other political subdivision, but shall be payable solely from the revenues or assets of the agency."); *see also id.* § 13-23-124(a)(2) ("Each obligation issued under this chapter shall contain on the face thereof a statement to the effect that the agency shall not be obligated to pay the same, nor the interest thereon, except from the revenues or assets pledged therefor and that neither the full faith and credit, nor the taxing power of the state, or of any political subdivision thereof is pledged to the payment of the principal of or the interest on such obligation.").

11. THDA submitted Tennessee's Homeowner Assistance Fund plan to U.S. Department of the Treasury, and "[w]ith approval provided by the office of the Governor, the Tennessee Housing Development Agency (THDA) [administers] the [Homeowner Assistance Fund] funds to those eligible homeowners experiencing a financial hardship related to the Covid-19 pandemic." Plan Narrative at 2. In sum, THDA developed, marketed, and administers the Tennessee Homeowner Assistance Fund (or "HAF") program.

12. Defendant Ralph Perrey is the Executive Director of THDA. THDA, About Us. As Executive Director, Defendant Perrey is responsible for the operation of THDA and the development, implementation, and administration of its programs, including the Tennessee Homeowner Assistance Fund program. Defendant Perrey signed and certified THDA's Tennessee Homeowner Assistance Fund plan submission to the U.S. Department of the Treasury. THDA, U.S. Dep't of the Treasury, Homeowner Assistance Fund Plan HAFP-0079, at 22 (December 2021),

https://perma.cc/C6QB-JPFA ("Tennessee Plan Submission"). Defendant Perrey is sued in his official capacity.

13. Defendant Lindsay Hall is the Chief Operating Officer of Single Family Programs at THDA. As Chief Operating Officer of Single Family Programs, Defendant Hall oversees the development, implementation, and administration of THDA's programs, including the Tennessee Homeowner Assistance Fund program. Defendant Hall was listed as the Primary Contact on THDA's submission to the U.S. Department of the Treasury. *Id.* at 20. Defendant Hall is sued in her official capacity.

14. Defendant Rick Neal is the Chair of THDA's Board of Directors. THDA, Board Members, https://perma.cc/LQ5E-Z87N. As the Chair of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Neal is sued in his official capacity.

15. Defendant Stephen Dixon is the Vice Chair of THDA's Board of Directors. *Id.* As the Vice-Chair of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Dixon is sued in his official capacity.

16. Defendant Corey Divel is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Divel is sued in his official capacity.

17. Defendant Jim Bryson is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs,

including the Tennessee Homeowner Assistance Fund program. Defendant Bryson is sued in his official capacity.

18. Defendant Tre Hargett is the Tennessee Secretary of State and a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Hargett is sued in his official capacity.

19. Defendant Maeghan Jones is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, she oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Jones is sued in her official capacity.

20. Defendant David Lillard is the Tennessee State Treasurer and a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Lillard is sued in his official capacity.

21. Defendant Michael A. Miller is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Miller is sued in his official capacity.

22. Defendant Rob Mitchell is the Deputy Counsel to Tennessee Governor Bill Lee and a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Mitchell is sued in his official capacity.

23. Defendant Jason E. Mumpower is the Tennessee Comptroller of the Treasury and a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Mumpower is sued in his official capacity.

24. Defendant Hancen Sale is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Sale is sued in his official capacity.

25. Defendant Eva Romero is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, she oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Romero is sued in her official capacity.

26. Defendant Dan Springer is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Springer is sued in his official capacity.

## LEGAL FRAMEWORK

27. Federal law prohibits government officials from discriminating on the basis of race in the administration of government programs.

28. As the Supreme Court recently explained, the "'core purpose' of the Equal Protection Clause [is] 'do[ing] away with all governmentally imposed discrimination based on race.'" *SFFA*, 600 U.S. at 206 (citation omitted). And "[e]liminating racial discrimination means eliminating *all of it*." *Id.* (emphasis added); *see Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024) ("*Fearless Fund Mgmt.*") (citation omitted) (describing "race

discrimination as 'subtle, pervasive, and essentially irremediable'" and noting that the burden of complying with Civil Rights statutes "pales in comparison to the interest in rooting out race discrimination in all its forms").

29. Title VI codifies that core purpose of equal protection, providing that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

30. Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n. 23 (2003)).

31. Under both Title VI and the Equal Protection Clause, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

32. Strict scrutiny is the most "daunting" standard of review. *SFFA*, 600 U.S. at 206. And for good reason— "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (citation omitted). That is why, under strict scrutiny, "[g]overnment policies that classify people by race are presumptively invalid," and "[t]o overcome that presumption, the government must show that favoring one race over another is necessary to achieve a compelling state interest." *Holman v. Vilsack*, 2021 WL 2877915, at *6 (W.D. Tenn. July 8, 2021) (quoting *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021)); *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 926 (11th Cir. 1997) ("The essence of the 'nar-

rowly tailored' inquiry is the notion that explicitly racial preferences . . . must be only a 'last resort' option." (quoting *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993))). Under strict scrutiny, courts ask (1) "whether the racial classification is used to 'further compelling governmental interests'" and, if so, (2) "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 206-07 (citations omitted). But the Supreme Court has identified "only two compelling interests that permit resort to race-based government action"—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Outside of these "rare" and "most extraordinary case[s]," the Court has held that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208 (citation omitted).

33.     In sum, these constitutional and statutory standards require that all applicants for assistance in Tennessee—for school admission, government contracts, or, as relevant here, government assistance—receive "an application process that is race neutral—a right that the Supreme Court has described as 'foundational,' 'fundamental,' 'transcendent,' and 'universal.'" *Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*, 2024 WL 3625684, at *5 (N.D. Tex. July 31, 2024) ("*Founders First Cmty.*") (quoting *SFFA*, 600 U.S. at 201-06).

## FACTUAL ALLEGATIONS

### I.     THDA's Discriminatory Homeowner Assistance Fund Program

#### A.  American Rescue Plan Act's Homeowner Assistance Fund

34.     In March 2021, during the COVID-19 Pandemic, Congress enacted the American Rescue Plan Act ("ARPA" or "Act"), which (among other things) established the Homeowner As-

sistance Fund. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 3206, 135 Stat. 4, 63-67 (2021) (codified at 15 U.S.C. § 9058d).

35.     The fund, managed by the U.S. Department of the Treasury ("Treasury"), was designed to "prevent[ ] homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacements of homeowners experiencing financial hardship." 15 U.S.C. § 9058d(c).

36.     Under the Act, the Treasury allocates funds to states "based on homeowner need" within each state, and the states distribute those funds as grants to homeowners who meet the states' respective requirements. *Id.* § 9058d(d)(2).

37.     The Act delegates authority to the Treasury to administer the overall program for purposes of distributing funds to the states, but it largely leaves states to run their own specific programs based on their own implementation plans. The Treasury initially released 10% of each state's eligible funds for states to use in implementing pilot programs. To receive the rest of the funds, states were required to submit their proposed plans to implement and administer the full program. When states submitted their plans, they requested a specific amount of funds. The Treasury reviewed the states' plans and provided feedback and recommendations before approving the plans and distributing the remaining funds. U.S. Dep't of the Treasury, HAF Plans, https://perma.cc/PZ4T-KQR2 ("U.S. Dep't of the Treasury HAF Plans").

### B. U.S. Department of the Treasury's Guidance and the Definition of Socially Disadvantaged Individuals

38.     The Act requires states to prioritize the distribution of funds to target specific populations of homeowners.

39.     First, the Act specifies that "[n]ot less than 60 percent of" funds shall be used to "assist homeowners having incomes equal to or less than 100 percent of the area median income

for their household size or equal to or less than 100 percent of the median income for the United States, . . . whichever is greater." 15 U.S.C. § 9058d(c)(2).

40.     Second, states must "prioritize remaining funds to socially disadvantaged individuals." *Id.*

41.     The Act does not define "socially disadvantaged individuals."

42.     In April 2021, the Treasury issued guidance to advise states on how to implement the HAF program. Among other things, the April 2021 guidance provided a recommended definition of "socially disadvantaged individual," explicitly defining that term based on race and including a presumption that individuals of particular races are socially disadvantaged:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, and Asian Americans and Pacific Islanders. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with the procedures set forth at 13 CFR 124.103(c) or (d).

U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2 (Apr. 14, 2021) (emphasis omitted), https://perma.cc/R4PD-4V8A.

43.     A few months later, in August 2021, the Treasury issued updated guidance redefining the term "socially disadvantaged individual." The new definition still provided that individuals who were "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society" were socially disadvantaged. The full updated proposed definition is as follows:

> Socially disadvantaged individuals are those whose ability to purchase or own a home has been impaired due to diminished access to credit on reasonable terms as compared to others in comparable economic circumstances, based on disparities in homeownership rates in the HAF participant's jurisdiction as documented by the U.S. Census. The impairment must stem from circumstances beyond their control.

> Indicators of impairment under this definition may include being a (1) member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society, (2) resident of a majority-minority Census tract; (3) individual with limited English proficiency; (4) resident of a U.S. territory, Indian reservation, or Hawaiian Home Land, or (5) individual who lives in a persistent-poverty county, meaning any county that has had 20% or more of its population living in poverty over the past 30 years as measured by the three most recent decennial censuses. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with a process developed by a HAF participant for determining whether a homeowner is a socially disadvantaged individual in accordance with applicable law, which may reasonably rely on self-attestations.

*The Homeowner Assistance Fund in the American Rescue Plan Act: In Brief*, Cong. Rsch. Serv. at 8 (Sept. 20, 2021), https://perma.cc/2RND-HCG5 (quoting U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2-3 (Aug. 2, 2021)).

44.     The Treasury has used the same definition of socially disadvantaged individual in subsequent versions of the guidance, including the current version. *See* U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2-3 (June 12, 2023), https://perma.cc/9VD6-4BPD.

45.     The Treasury's guidance is not mandatory or binding on the States. States had discretion to design and tailor their own HAF programs, including how they conducted outreach and marketing, how they determined eligibility, what relief was available, and how they defined key terms, including "socially disadvantaged individuals." Indeed, as explained below, some states, like California and Texas, chose to define "socially disadvantaged individual" based on race-neutral factors different than what Treasury recommended in its guidance. *See infra* ¶¶ 170-71. Thus, whereas California adopted a race-neutral program, Tennessee chose a race-based program.

46.     In December 2025, the Treasury sent a communication to all States and other entities receiving HAF money confirming that using a race-based definition of socially disadvantaged individuals, or otherwise prioritizing assistance based on an applicant's race or ethnicity as a part of the HAF program is a violation of federal civil rights laws. THDA received this communication.

### C. Tennessee Homeowner Assistance Fund Program

47. THDA submitted its initial proposal for implementing its Tennessee Homeowner Assistance Fund plan in August 2021, and after receiving and responding to feedback from the U.S. Treasury, THDA's final proposal was approved in December 2021. THDA was awarded $168,239,035 in HAF funds. U.S. Dep't of the Treasury HAF Plans.

48. When submitting its proposed plan to the U.S. Treasury for feedback, THDA signed and submitted a Title VI Assurances document, "assur[ing] that [THDA] will comply with Title VI of [the] Civil Rights Act of 1964." Tennessee Plan Submission at 21; *see* U.S. Dep't of the Treasury, Assurances of Compliance with Civil Rights Requirements, OMB Approved No. 1505-0271, https://perma.cc/Q9QX-UNDE (default form). But THDA knew at the time this assurance was blatantly false, and the agency intended all along to discriminate on the basis of race.

49. THDA entitled its HAF program the "Tennessee Homeowner Assistance Fund."

50. THDA's Tennessee Homeowner Assistance Fund program launched in January 2022. THDA, THDA Launches Program to Help COVID-Related Mortgage Delinquencies (Jan. 11, 2022), https://perma.cc/GB6B-D396.

51. Under THDA's Tennessee Homeowner Assistance Fund program, homeowners were eligible for up to $40,000 of relief. *Id.* Eligible homeowners could obtain relief in the form of mortgage reinstatement, monthly payment assistance, assistance with past due homeowners' insurance, property taxes, and homeowner association payments, loss mitigation options, other expenses related to a period of forbearance, delinquency, or default, and assistance with partial

payments for certain government-backed loans. Plan Narrative at 16-17; THDA, Homeowner's

Assistance Fund (June 1, 2023), https://tinyurl.com/2v26xy5x, attached as Exhibit 1.[2]

52.     On August 6, 2023, THDA limited the relief available under its program, closing

the program to applications for mortgage reinstatement and related assistance. THDA, Homeowner

Assistance Fund (Nov. 29, 2023), https://tinyurl.com/bddjrcb5, attached as Exhibit 2. After that

date, THDA only accepted applications for partial claim reimbursement for certain government-

backed loans, like FHA loans. *Id.*[3] As explained below, THDA's program was race-based from top

to bottom, and its decision to limit the relief available under the program was part of THDA's

intentional racial discrimination to target and prioritize funds to minority homeowners at the ex-

pense of white homeowners.

53.     THDA knew full well that limiting the program to recipients of the government-

backed loans was a method for directing money to "black and Hispanic/Latino borrowers." As

THDA explained in its Plan Narrative:

> Minority borrowers are more likely to use nonconventional loan products. *A higher per-*
> *centage of both black and Hispanic/Latino borrowers receive FHA-, VA- or USDA-insured*
> *home mortgage loans than white borrowers*. For example, in 2019, 64 percent of black
> households and 47 percent of Hispanic households purchased a home using a non-conven-
> tional loan compared with 34 percent of white households and 17 percent of Asian house-
> holds.

Plan Narrative at 15 (emphasis added). And the results of that continued discriminatory targeting

of minority borrowers are reflected in the demographic statistics of homeowners who were ap-

---

[2] Over the course of its Tennessee Homeowner Assistance Fund program, THDA has up-
dated its website, removing information that was previously available. Therefore, archived copies
of previous versions of THDA's Tennessee Homeowner Assistance Fund website are linked
throughout and attached as exhibits to this Complaint.

[3] However, it continued to process applications and distribute funds for applications sub-
mitted before August 6, 2023. THDA, *Homeowner Assistance Fund (HAF) Annual Report to*
*Treasury* at 5-6 (2023) ("2023 Annual Report"), attached as Exhibit 3.

proved for assistance. From Q3 2023, when THDA narrowed the relief available, to Q3 2024, the percentage of approved applications from white homeowners decreased and the percentage of approved applications from black homeowners increased. *Compare* U.S. Dep't of the Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q3, 2023, https://perma.cc/53ZF-DDF2 *with* U.S. Dep't of the Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q3, 2024, https://perma.cc/6CT2-TC2U.

54. Tennessee stopped accepting applications for its program on April 30, 2025, and the program closed on June 30, 2025. THDA, Homeowner Assistance Fund, https://perma.cc/L7KY-CLNW.

55. But even after June 30, 2025, THDA has continued to administer its program and process applications and payments. For example, Treasury quarterly reporting data shows that Tennessee continued to expend funds for at least six months after the program closed. *Compare* U.S. Dep't of the Treasury, Breakdown of Participant Program Assistance to Households, Homeowner Assistance Fund Quarterly Data Through Q2, 2025, https://perma.cc/4ST5-HDPH, *with* U.S. Dep't of the Treasury, Breakdown of Participant Program Assistance to Households, Homeowner Assistance Fund Quarterly Data Through Q4, 2025, https://perma.cc/VZJ7-DPZP.

56. THDA has refused to change its racially discriminatory methodology in reviewing and prioritizing applications from homeowners of its preferred races and ethnicities over those submitted by white homeowners. And the applications THDA received were the direct result of its intentionally discriminatory marketing and outreach.

57. Therefore, THDA's unlawful policy of discrimination is a continuing and ongoing violation of federal law.

58.     Moreover, nothing prevents THDA from using remaining funds to allow applicants to apply for mortgage reinstatement or other forms of relief in the future. THDA has simply chosen to distribute the funds on a racially discriminatory basis.

**D. THDA Considered Race When Developing, Conducting Outreach and Marketing for, and Administering its Tennessee Homeowner Assistance Fund Program.**

59.     In developing its Tennessee Homeowner Assistance Fund program, THDA chose to adopt the race-based definition of "socially disadvantaged individuals" not required by the Act.

60.     THDA's race-based definition of "socially disadvantaged individual" was more narrow and racially specific than the definition suggested in non-binding Treasury guidance by the Biden Administration.

61.     THDA explicitly defined socially disadvantaged individuals based on identification as a "minority race or ethnicity." Plan Narrative at 6. Specifically, "[u]sing guidance from procedures set forth at 13 CFR 124.103(c) or (d)," THDA defined "social disadvantage with the following process:"

> 1) First, if an individual identifies as a member of a minority race or ethnicity, then they are deemed socially disadvantaged.
>
> 2) If the individual's race and ethnic status is undetermined, then THDA will check to determine whether the individual accessed language assistance to determine if they are limited in English proficiency. If so, then the individual is deemed socially disadvantaged.
>
> 3) If the individual's status is still undetermined, THDA will determine the individual's census tract. If the individual lives in a tract that is majority-minority or has a poverty level of above 20%, the individual may be deemed socially disadvantaged.
>
> 4) Finally, if not applicable at the tract-level, then the individual's county of residence is one that has been deemed to have "persistent poverty," then the individual may be deemed socially disadvantaged.

*Id.*

62.     Thus, under THDA's program, "[i]ndividuals that identify as members of the groups" specified in THDA's Plan Narrative document "in their application" are "considered so-

cially disadvantaged." *Id.* These include "American Indian/Alaska Native," "Asian," "Black or African American," "Native Hawaiian/Pacific Islander," and "Hispanic or Latino." *Id.*; *see also id.* at 7 (defining "majority-minority" as "comprised of more than 50% minorities (as measured by individuals who are Black, American Indian, Asian, Native Hawaiian or Pacific Islander, some other race, or two or more races, or Hispanic)"). White homeowners are excluded from THDA's definition of "socially disadvantaged individual." *See id.* (defining "Racial composition" for purposes of "[p]roposed tract-level factors of social disadvantage & statistics in Tennessee" as "all non-White, owner-occupied households"); *id.* at 8 (defining "[m]ajority-minority" in census tracts as "non-white persons comprising more than 50% of the population").

63. In other words, under THDA's plan, non-white applicants were automatically socially disadvantaged individuals, but white applicants had to meet one of the Treasury definition's other factors (e.g., limited English proficiency, persistent poverty county) and take additional steps to be considered socially disadvantaged.

64. THDA utilized its race-based definition of socially disadvantaged individuals in deciding how to develop its program to target aid to those individuals, how to best reach those individuals through direct outreach and marketing, which homeowners to assist with the application process, and how to prioritize granting applications and distributing program funds. In doing so, it created and implemented a scheme that prioritized homeowners from its preferred racial groups over white homeowners at every stage of the process. THDA's goal was straightforward— maximize participation of "socially disadvantaged individuals" at every step of the process from outreach and recruitment to final distribution of funds.

65. To start, THDA carefully studied the racial makeup of homeowners in the state and developed its plan to target aid to homeowners of its preferred racial and ethnic groups over white homeowners.

66. THDA "obtained and reviewed quantitative data . . . regarding which demographic segments in its jurisdiction have historically experienced discrimination in the housing or housing finance market." Tennessee Plan Submission at 3.

67. THDA analyzed "data" regarding "mortgage delinquency, forbearances and unemployment" in the state, but it "overlap[ed]" that "information with minority . . . demographics" to get "a clear picture of those areas of concentration that should reach those populations that may be designated as socially disadvantaged,"—*i.e.*, racial minorities. THDA, HAFP-0079-Tennessee Treasury Feedback for Resubmission of Plan at 2, https://perma.cc/A2DV-FXVW ("Treasury Feedback")

68. THDA calculated the percentage of minority population in the zip codes with highest percentage of mortgage forbearance. Plan Narrative at 4-5. It did the same for the top majority-minority zip codes, comparing both forbearance and delinquency rates in those zip codes. *Id.* at 5 (concluding that "areas with more minority populations are more likely to have homes in forbearance"). Based on those calculations, THDA concluded that it would "focus[ ] [its] efforts on areas with higher shares of minority populations [to] ensure that assistance is targeted towards areas with more homes in mortgage forbearance." *Id.* THDA's "[m]apping [of] these areas of concentration assisted in the development of outreach and marketing efforts" it implemented. Treasury Feedback at 2.

69. THDA also calculated the race and ethnicity of owner-occupied households in the State, and it used that information to estimate the number of "socially disadvantaged individuals"

in the state. Plan Narrative at 6. In total, THDA determined that there were 234,532 "non-White, owner-occupied households" in the state. *Id.* at 7.

70. THDA also analyzed the "[t]op ten census tracts by percent of minority households" and the percentage of "minority owner-occupied housing" within those tracts. *Id.*

71. THDA also analyzed "[q]uantitative data" and "studies" regarding "[m]inority [d]isparities in Tennessee." Plan Narrative at 13-15. THDA looked to its own internal research and external studies and asserted that "racial and ethnic discrimination persist in the contemporary U.S. housing market." *Id.* at 13. In particular, THDA emphasized the "disparities . . . between white households and racial and ethnic minorities, particularly black and Hispanic/Latino households." *Id.* These general studies and data regarding racial disparities in the United States—entirely unconnected with THDA's prior actions or the effects of the COVID-19 pandemic's impact on homeowners—informed THDA's planning and development of its Tennessee Homeowner Assistance Fund program. *Id.*

72. THDA also determined that "[c]ounties that have a high percentage of black households also have a relatively higher percentage of all loans originated for black borrowers (compared with other Tennessee counties). However, even among counties with a high percent of black households, there is still a large discrepancy between the black households['] share in total households and their share in total home purchase loan originations." *Id.* at 15.

73. THDA had specific goals to recruit and distribute funds to minority homeowners identified in its program design and analysis. For example, it set goals based on the "[p]ercentage of targeted population households reinstated," Tennessee Plan Submission at 14; THDA, *Homeowner Assistance Fund (HAF) Annual Report to Treasury* at 3 (2022), attached as Exhibit 4 ("2022 Annual Report"), and "[t]argeting vulnerable populations-minority households," Plan Narrative at

28. Moreover, to "determine positive outcomes for the program," it has tracked certain "metrics," including "[a] notable reduction in mortgage burden for homeowners . . . who are deemed 'socially disadvantaged'" and an "Index Measure of [National Median Income ("NMI")] and Social Disadvantage," which includes monitoring the "[p]ercent of applicants and recipients of each racial and ethnic group by NMI." Treasury Feedback at 5.

74. Using this racial demographic information, THDA set out to achieve its race-based goals. To start, as part of its administration of the Tennessee Homeowner Assistance Fund program, THDA created and implemented a plan to intentionally target socially disadvantaged individuals with direct outreach and marketing to inform them about the program to generate applications from homeowners of its preferred racial and ethnic groups.

75. THDA's targeted outreach scheme was the first stage of the Tennessee Homeowner Assistance Fund program's selection process. This first step was designed to tee up applications from homeowners of THDA's preferred racial and ethnic groups at the expense of white homeowners.

76. At this stage, THDA identified which homeowners it wanted to apply based on race and implemented a detailed outreach strategy to recruit those homeowners to apply. But it chose not to do the same for white homeowners in the state.

77. In marketing and advertising its program to inform Tennessee citizens about the availability of funds and how to apply, THDA targeted the agency's preferred racial and ethnic minorities—at the expense of white homeowners—based on its definition of socially disadvantaged individuals. THDA's plan submission indicates that THDA made "public communications" and undertook "community outreach efforts" to market its Tennessee Homeowner Assistance Fund program by partnering "with organizations that primarily target" "member[s] of a group that has

been subjected to racial or ethnic prejudice or cultural bias within American society." Tennessee Plan Submission at 10.

78. In developing its marketing plan, THDA "use[d] the data" it analyzed "to target continued outreach to minority communities," and THDA's "communication department" "work[ed] with the executive staff and the research staff to identify [targeting] priorities" and "then develop[ed] a marketing plan" to target those communities. Plan Narrative at 16. As noted above, THDA used "minority . . . demographics" to determine "areas of concentration that should reach those populations that may be designated as socially disadvantaged," which informed THDA's "development of outreach and marketing" plans. Treasury Feedback at 2.

79. To accomplish its race-based targeting-and-marketing plan, THDA "divided its 95 counties into targeting tiers based on demographics that could indicate higher percentages of persons that might need HAF assistance or higher percentages of homeowners that meet the definition of 'socially disadvantaged.'" 2022 Annual Report at 5; 2023 Annual Report at 6 (similar). The top "Tier 1 counties" in this marketing plan "saw targeted media such as Spanish print and radio ads" and "ads in African American targeted print." 2022 Annual Report at 5; 2023 Annual Report at 6 (similar).

80. As a part of its targeted marketing plan, THDA "targeted" its "[o]utreach" "to non-profit and community organizations in different local communities across the state who directly serve [limited English proficiency] populations (Hispanic/Latino, Islamic and Kurdish)." Treasury Feedback at 4. And as a part of THDA's "media outreach plan," the agency "plac[ed] Spanish language content in both paid and earned media (print, radio, TV, minority, digital) in counties of the state where greater than 50% of the population earns 100% of AMI, greater than 10% of homes are owned/occupied by minorities and greater than 5% speak English less than very well." *Id.*

81.     At the start of its program, THDA "initially share[d] advertisement and press release content and media distribution plans with targeted non-profit organizations that serve [limited English proficiency], other minority and socially disadvantaged populations to receive feedback on creating content and utilizing media that resonates with targeted segments of borrowers." *Id.* THDA specifically included "[m]inority media outlets" in its "HAF media outreach plan." *Id.*

82.     THDA "monitor[ed]" its targeted marketing plan "closely" and "adjust[ed]" it "as necessary to ensure that the majority of" marketing was directed "to socially disadvantaged households"—*i.e.*, racial and ethnic minorities. *Id.* And as its program progressed, THDA "reviewed" "metrics" "to determine whether additional efforts are needed to reach and serve target populations" and considered taking actions such as "hiring a marketing partner that specializes in . . . minority consumer audiences to ensure we are reaching borrowers that have historically been underserved by the conventional market." *Id.*; *see* 2022 Annual Report at 5 (assessing performance of targeting plan); 2023 Annual Report at 6 (same); *see also* Treasury Feedback at 5 (to keep track of the number of socially disadvantaged individuals served, THDA "compare[d] the percentage of recipients with the composition of the county," which "allow[ed] [THDA] to determine whether the funds are being appropriately targeted to counties given their demographic compositions, in alignment with the included THDA marketing strategy").

83.     THDA also utilized mortgage servicers to direct outreach about the Tennessee Homeowner Assistance Fund program to individuals based on race. *See* Tennessee Plan Submission at 3-4 (THDA "communicate[d] with mortgage servicers regarding the development of its program design"); Plan Narrative at 29 (THDA worked with "larger national servicers" over "months"); 2022 Annual Report at 6 (THDA "coordinated with servicers"); 2023 Annual Report at 7 (same).

84. THDA conducted "outreach events in targeted communities" and deployed "advertising and media opportunities serving targeted populations." Plan Narrative at 28.

85. THDA also utilized "non-profit housing counselor agencies" to "offer assistance to" minority homeowners. Plan Narrative at 16. THDA used these counseling agencies to inform minority homeowners about its program and assist them with applying because "[t]heir business activities reach those populations that need the assistance but are least likely to apply," "include[ing] Latinos, immigrants, [and] minorities, . . . which are the HAF targeted populations." Plan Narrative at 29; *see also* Treasury Feedback at 1 (describing housing counseling agencies as THDA's "boots on the ground" and stating that THDA would utilize them for "[e]arly and continual intervention").

86. THDA's targeted outreach and marketing efforts were the first step of its selection process to prioritize aid to socially disadvantaged individuals based on race. To tee up more applications from and provide more funds to minority homeowners, THDA specifically informed homeowners in its preferred racial groups about the program but did not do the same for white homeowners. Through this coordinated scheme of direct outreach, THDA was able to ensure that minority homeowners were informed about the program before white homeowners. At the same time, THDA's outreach scheme left white homeowners—who would have otherwise learned of the program through their mortgage servicers, housing counseling agencies, community events, or marketing—in the dark or delayed their learning about the program. In other words, white homeowners who were otherwise eligible for the program were placed at a strategic disadvantage in the first step of THDA's program that made it more difficult for them to obtain aid compared to minority homeowners. In its time-limited program, THDA's race-based outreach strategy effectively ex-

cluded white homeowners who did not learn about the program before the program closed to applications for relief.

87.   Put differently, THDA intentionally targeted outreach about its program to its preferred racial and ethnic groups, not simply to increase the number of applicants, but, rather, to promote THDA's express racially discriminatory agenda. Thus, THDA's outreach strategy and efforts were the first step in reaching its goal of prioritizing more funding to homeowners of its preferred racial and ethnic groups than white homeowners.

88.   If THDA had not discriminated on the basis of race in its outreach and marketing, it would have conducted race-neutral outreach efforts. Money and time spent on race-based targeting of socially disadvantaged individuals would have been repurposed to reach homeowners on a race-neutral basis. For example, instead of using mortgage servicers and other organizations to directly inform only those it deemed socially disadvantaged individuals, it would have used those servicers and organizations to inform all of the homeowners with mortgages in the state. Indeed, given that THDA had the ability to instruct mortgage servicers and other organizations in Tennessee to direct targeted outreach to minority homeowners, they also had the ability to instruct those servicers to inform all homeowners.

89.   THDA had substantial federal funds available to conduct race-neutral outreach. Moreover, THDA could have used additional state funds to market its program on a race-neutral basis.

90.   THDA also prioritized assistance with the application process to applicants of THDA's preferred minority racial and ethnic groups over white applicants. *See* Plan Narrative at 17 (discussing assistance for completing applications). In particular, THDA used housing counseling agencies to provide "application assistance" and other aid to "minorities" throughout the ap

plication process. *Id.* at 29. In other words, applicants were treated differently during the intake and application submission and review process based on their race.

91. In reviewing and granting applications, THDA prioritized (and continues to prioritize) applications based on race, prioritizing applications submitted by THDA's preferred minority homeowners over white homeowners.

92. Under its plan, THDA also used its race-based "socially disadvantaged individual" definition to prioritize assistance: "[A]ny amount not made available to homeowners at or below 100% AMI should be prioritized for individuals who are 'socially disadvantaged.'" Plan Narrative at 6; *see also* THDA, *Homeowner Assistance Fund Program (HAF) Summary Guideline Phase 1* at 2, https://perma.cc/KR9J-KAD2 ("Any amount not made available to homeowners that meet this income-targeting requirement must be prioritized for assistance to socially disadvantaged individuals, with funds remaining after such prioritization being made available for other eligible homeowners."). Upon information and belief, THDA used its race-based socially disadvantaged individual definition to prioritize assistance to homeowners of THDA's preferred racial and ethnic groups over white homeowners at all income levels of applicants.

93. THDA's prioritization included preference in granting and denying applications and distribution of funds—*i.e.*, applications submitted by minority homeowners were given priority over applications submitted by white homeowners.

94. Upon information and belief, THDA required all applicants to select their race in completing and submitting an application. It then used applicants' race to determine whether they should be prioritized for assistance as socially disadvantaged individuals.

95. THDA also monitored the "number of applicants served and percentage of applicants served in targeted populations," the "[n]umber of outreach events in targeted communities,"

and the "[n]umber of advertising and media opportunities serving targeted populations." Plan Narrative at 28. THDA "closely" monitored this information so that it could "adjust marketing and guidelines as necessary to ensure that the majority of those [assisted above the national median income] are . . . socially disadvantaged households." Treasury Feedback at 4.

96.     In its 2022 and 2023 annual reports to the U.S. Department of the Treasury, THDA touted the fact that over half of the "homeowners who have received funds meet the definition of 'socially disadvantaged.'" 2022 Annual Report at 5; 2023 Annual Report at 6.

97.     THDA's race-based prioritization throughout all steps of its program occurred throughout the administration of the program and is still happening today.

98.     THDA's use of a race-based definition of socially disadvantaged individuals is reflected in the demographics of its application statistics. Out of the approved applications, *49% of the homeowners were black and 49% were white,* Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q3, 2024, https://perma.cc/A46C-V68T, *despite the fact that*, *according to THDA's own analysis, 10.5% of Tennessee owner-occupied households are black and 86.4% are white*, Plan Narrative at 6; *see also* U.S. Census Bureau, Quick Facts: Tennessee, https://tinyurl.com/bdvz244p (16.5% of Tennessee citizens are black and 78.4% are white). This dramatic difference cannot be explained by income disparities or other race-independent reasons. For example, comparing census and poverty rate data, about 29.1% of Tennessee citizens below the poverty line are black and 69.2% are white. *See id.*; KFF, State Health Facts: Poverty Rate by Race/Ethnicity (2022), https://perma.cc/PQD3-DMVA.

## II.    Effect of THDA's Racial Discrimination on Plaintiff Norlin Jones

99.    Because of THDA's race-based implementation of its Tennessee Homeowner Assistance Fund program, Plaintiff Norlin Jones, like other white Tennessee homeowners, was deprived of the opportunity to obtain much needed financial assistance because of his race.

100.    Plaintiff Jones is a resident of Tennessee.

101.    Plaintiff Jones is white.

102.    Plaintiff Jones owns a home in Madison County, Tennessee, and has a mortgage on the home.

103.    Plaintiff Jones was present in Tennessee when THDA conducted race-based outreach and marketing about its Tennessee Homeowner Assistance Fund and administered the program.

104.    Prior to the COVID-19 pandemic, Plaintiff Jones worked at a manufacturing plant.

105.    After the COVID-19 pandemic began, Plaintiff Jones's hours were cut at the manufacturing plant due to the pandemic. As a result, Plaintiff Jones experienced a significant decrease in income.

106.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Jones struggled to pay his bills, including his mortgage.

107.    Due to THDA's discriminatory targeted outreach and marketing regarding its Tennessee Homeowner Assistance Fund program, Plaintiff Jones never heard about the program.

108.    Had Plaintiff Jones been informed about the Tennessee Homeowner Assistance Fund program, he would have applied. But THDA did not inform Plaintiff Jones about its program because he did not qualify for targeted outreach and marketing due to his race.

109. THDA conducted a targeted outreach and marketing campaign as a central part of its Tennessee Homeowner Assistance Fund program to inform homeowners of its preferred racial and ethnic groups about the program but did not perform the same outreach efforts to white homeowners like Plaintiff Jones. That discriminatory treatment was intentional and by strategic design. Seeking to advantage one race over another, and, specifically, to tee up more applications from minority homeowners than white homeowners, THDA took specific actions to inform homeowners of its preferred racial and ethnic groups about the program but did not do the same for white homeowners. THDA thus erected an informational barrier that made it more difficult for white homeowners to obtain funds compared to minority homeowners and that prioritized money to THDA's preferred racial and ethnic groups.

110. Specifically, THDA conducted outreach through mortgage servicers, targeted events, non-profits and community groups, housing counseling agencies, direct communications, and targeted marketing and advertising to inform socially disadvantaged individuals about the Tennessee Homeowner Assistance Fund program. THDA did not inform Plaintiff Jones about the program through any such targeted outreach or marketing. Had THDA done so, Plaintiff Jones would have applied while the program was still accepting applications and would have received financial assistance through the program.

111. Because Plaintiff Jones never heard about the program as a result of THDA's discriminatory targeted outreach and marketing, he was unable to apply for and obtain financial assistance for which he would have applied. Had THDA not been engaging in racial discrimination, Plaintiff Jones would have received assistance.

112. Had THDA conducted outreach on a race-neutral basis, it would have informed Plaintiff Jones about the program, and he would have applied for assistance. THDA could have

conducted numerous race-neutral outreach efforts that would have reached Plaintiff Jones and other white homeowners based on the data obtained through its program design research. For example, THDA had the ability to instruct all mortgage servicers in the state to inform all customers about the program or to provide direct communications to all homeowners who owned a home and had a mortgage on the home. Either race-neutral outreach effort would have reached white homeowners, including Plaintiff Jones.

113. Due to THDA's discriminatory targeted outreach and marketing, Plaintiff Jones was treated unequally in that he was deprived of an opportunity to apply for financial assistance he, like any homeowner, would have wanted and for which he could have applied. Had Plaintiff Jones known about the Tennessee Homeowner Assistance Fund program, he would have applied for the program and would have met the program's eligibility requirements.

114. Both the inability to apply on equal footing with other homeowners and the deprivation of funds for which Plaintiff Jones would have received are independent injuries caused by THDA's racial discrimination.

115. Likewise, Plaintiff Jones was injured in that he was deprived of truthful information about the Tennessee Homeowner Assistance Fund program in violation of Title VI as a result of THDA's race-based targeted outreach and marketing scheme. THDA's failure to inform Plaintiff Jones due to his race harmed him, leaving him unable to obtain the financial aid offered by the Tennessee Homeowner Assistance Fund program.

116. Plaintiff Jones was ready and able to apply for relief for his primary residence through THDA's Tennessee Homeowner Assistance Fund program when the program was accepting applications. Specifically, Plaintiff Jones was ready to apply for relief through THDA's program because he was in need of financial assistance due to the COVID-19 hardships he experi-

enced and was genuinely interested in government grant awards to help mitigate the impact of those hardships.

117. Because THDA's Tennessee Homeowner Assistance Fund program is closed to new applications, Plaintiff Jones is prohibited from applying for relief.

118. Therefore, Plaintiff Jones was harmed and continues to be harmed by THDA's discrimination.

119. Had THDA informed Plaintiff Jones about the program, he would have applied for and received assistance before the program closed to new applications in April 2025. Indeed, given Plaintiff Jones's financial hardship, he would have jumped at the opportunity to apply for free money, had THDA informed him about it. If THDA had not discriminated on the basis of race in administering the program, Plaintiff Jones would have received much-needed COVID-19 relief.

120. Plaintiff Jones was and still is ready and able to apply for relief through THDA's Tennessee Homeowner Assistance Fund program.

121. Were the program to be reopened on a race-neutral basis, Plaintiff Jones would apply for and receive assistance. But, because of how THDA administered and continues to administer its race-based program, including limiting the relief available, Plaintiff Jones is currently unable to apply for assistance.

122. But for THDA's discrimination on the basis of race in administering the program, Plaintiff Jones would have been equally targeted, would have had an equal opportunity to learn about and apply for the Tennessee Homeowner Assistance Fund program, and would have applied for and received much needed COVID-19 relief.

**CLASS ALLEGATIONS**

123. Plaintiff brings this action on behalf of himself, and other Tennessee homeowners similarly entitled to relief.

124. The Class here consists of:

    a. All Tennessee homeowners who are white, who would have qualified for funds under THDA's Tennessee Homeowner Assistance Fund program but did not meet THDA's definition of socially disadvantaged individual, and who were unable to obtain program funds due to THDA's discrimination.

125. Class members are seeking damages from THDA under Title VI for unlawful discrimination in the development, outreach and marketing, and administration of the Tennessee Homeowner Assistance Fund program.

126. Class members are also seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Tennessee Homeowner Assistance Fund program unlawful and requiring THDA to stop administering the program in a racially discriminatory manner.

127. In the alternative, Class members are seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Tennessee Homeowner Assistance Fund program unlawful, requiring THDA to stop administering the program in a racially discriminatory manner, and requiring THDA to reopen the program to all forms of mortgage assistance, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis.

128. The Class shall exclude any judicial officers presiding over this action, as well as members of their immediate families and members of their judicial staffs. The Class shall also exclude any attorney appearing in this action and any juror assigned to this action, as well as members of their immediate families. The class shall also exclude any individual who previously

brought an action against Defendants raising Title VI and Equal Protection claims involving the Tennessee Homeowner Assistance Fund as described herein and settled those claims or obtained a judgment in his or her favor.

129. The proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery. But given the number of homeowners in Tennessee and the thousands of homeowners who applied for the Tennessee Homeowner Assistance Fund program, there are at least thousands of members of the proposed Class.

130. Common questions of law and fact exist with respect to the Class. *See* Fed. R. Civ. P. 23(a)(2). Those questions include:

    a. Whether THDA defined and applied its "socially disadvantaged individual" criterion in a racially discriminatory manner;

    b. Whether THDA intentionally targeted non-white homeowners in its Tennessee Homeowner Assistance Fund marketing;

    c. Whether THDA intentionally prioritized non-white homeowners in its administration of the Tennessee Homeowner Assistance Fund program;

    d. Whether THDA discriminated against Class members on the basis of their race;

    e. Whether THDA's challenged conduct violates Title VI; and

    f. Whether THDA's challenged conduct violates the Equal Protection Clause.

131. Plaintiff's claims are typical of those of the other Class members. *See* Fed. R. Civ. P. 23(a)(3). All members of the Class are Tennessee homeowners, who could have applied for funds under the Tennessee Homeowner Assistance Fund program, are white and otherwise did not

meet THDA's definition of socially disadvantaged individuals, and who were unable to obtain program funds due to THDA's discrimination. They were therefore similarly affected by THDA's wrongful conduct complained of herein.

132. Plaintiff will fairly and adequately protect the interests of all Class members. *See* Fed. R. Civ. P. 23(a)(4). Plaintiff's counsel is competent and experienced in litigating complex cases involving class actions and litigating federal Constitutional and statutory rights. Plaintiff has no interests adverse or antagonistic to the Class.

133. The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3). The common questions of law and fact listed above predominate over any questions affecting only individual members of the Class. All Class members are entitled to similarly race-blind development, marketing, and implementation of state housing assistance programs distributing federal funds. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. The membership of the Class can be readily ascertained from analysis of records in the possession of Defendants, mortgage-servicer information, and publicly available data. Class-wide damages can also be readily calculated based on the information available in THDA's Tennessee Homeowner Assistance Fund program. Prosecution as a class action will eliminate the possibility of unnecessary, repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who otherwise could not bear the expense and burden of seeking redress on an individual basis for the conduct alleged herein, particularly given that the Class involves homeowners in need of mortgage assistance in the wake of the COVID-19 pandemic.

134. The Class is also certifiable under Federal Rule of Civil Procedure 23(b)(2). *See Miller v. Vilsack*, 2021 WL 11115194, at \*8 (N.D. Tex. July 1, 2021) (certifying 23(b)(2) class in challenge to USDA's distribution of loan forgiveness to "socially disadvantaged" applicants). THDA has discriminated and continues to discriminate on grounds that apply generally to the Class—namely, administering the Tennessee Homeowner Assistance Fund program based on race. Therefore, declaratory and injunctive relief declaring that THDA's development, marketing, and implementation of its Tennessee Homeowner Assistance Fund program is unlawful and requiring THDA to stop administering the program in a racially discriminatory manner in the distribution of any remaining funds, or, in the alternative, to reopen the program to all forms of mortgage assistance, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis is appropriate respecting the Class as a whole.

## CLAIMS

### COUNT I
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN ADMINISTRATION OF TENNESSEE HOMEOWNER ASSISTANCE FUND PROGRAM IN VIOLATION OF TITLE VI AND EQUAL PROTECTION CLAUSE

135. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

136. **Federal law prohibits discrimination on the basis of race.** Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

137. This provision of Title VI may be enforced through suits by private individuals for damages and injunctive relief. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001) ("[I]n

a suit against a State [under Title VI] 'remedies (including remedies both at law and in equity) are available . . . to the same extent as such remedies are available . . . in the suit against any public or private entity other than a State.'" (quoting 42 U.S.C. § 2000d-7(a)(2)).

138. Moreover, States and state agencies who are considered arms of the state are not immune from suit under Title VI because "Section 1003 of the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. § 2000d-7, expressly abrogated States' sovereign immunity against suits brought in federal court to enforce Title VI." *E.g.*, *id.* at 280. States also waive their sovereign immunity from suit by accepting federal funds under Title VI. *See* 42 U.S.C. § 2000d-7.

139. "To state a claim for damages under [Title VI], a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal assistance." *Grimes v. Superior Home Health Care of Middle Tenn., Inc.*, 929 F. Supp. 1088, 1092 (M.D. Tenn. 1996) (citation omitted).

140. Intentional race discrimination can take the form of a policy that is discriminatory on its face or a facially neutral policy that was adopted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

141. "Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin" because "Title VI bears independent force beyond the Equal Protection Clause." *SFFA*, 600 U.S. at 309-10 (Gorsuch, J., concurring); *see Founders First Cmty.*, 2024 WL 3625684, at *3-4 (holding that plaintiff's discrimination claim pursuant to 42 U.S.C. § 1981 likely to succeed on the merits because program "discriminates against applicants . . . based on race").

142. But at a minimum, Title VI is coextensive with the protections of the Equal Protection Clause. U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (citation omitted); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause.").

143. **Racial classifications are subject to strict scrutiny.** Under both Title VI and the Equal Protection Clause, racial classifications are subject to strict scrutiny. "[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Therefore, state agencies may not provide a benefit, such as distribution of funds, on the basis of race without satisfying strict scrutiny.

144. Under strict scrutiny, the government must show that its racial classification "further[s] compelling governmental interests." *SFFA*, 600 U.S. at 206-07 (citation omitted). Remedying "societal discrimination," however, is never a compelling interest because "[s]uch an interest presents 'an amorphous concept of injury that may be ageless in its reach into the past.'" *Id.* at 226 (citation omitted). Thus, generalized claims of remedying past "societal discrimination" "cannot 'justify a [racial] classification that imposes disadvantages upon persons . . . who bear no responsibility for whatever harm the beneficiaries" of the race-based government "program are thought to have suffered." *Id.* (citation omitted). Moreover, a "generalized assertion" of "past discrimination" is not a compelling interest because it "provides no guidance for [the government] to deter-

mine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989).

145. Rather, for the government to have a compelling interest in remedying past discrimination, (1) "the policy must target a specific episode of past discrimination," (2) "there must be evidence of *intentional* discrimination in the past," and (3) "the government must have had a hand in the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361 (citing *J.A. Croson Co.*, 488 U.S. at 492, 498, 503).

146. If the government can show that a racial classification somehow serves a compelling interest, it then must show that its classification is "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207 (citation omitted); *Holman*, 2021 WL 2877915, at *5. To be narrowly tailored, a racial classification must be "sufficiently focused" on obtaining "measurable objectives warranting the use of race." *SFFA*, 600 U.S. at 230. This means that it must be targeted—*i.e.*, it cannot be over- or under-inclusive. *See id.* at 216; *see also Vitolo*, 999 F.3d at 361-62. Moreover, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *SFFA*, 600 U.S. at 218. Finally, a court may not uphold a race-based policy unless it is "satisfied that no workable race-neutral alternatives would" achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

147. **THDA's Use of Race in Prioritizing Minority Homeowners Fails Strict Scrutiny.** THDA received federal financial assistance from the HAF program and intentionally used those federal funds to prioritize aid to minority homeowners at the expense of white homeowners at every stage of the process, from design, to outreach and marketing about its Tennessee Homeowner Assistance Fund program, to assistance with the application process, and ultimately the distribution of funds.

148. THDA used the term "socially disadvantaged individual" as a proxy for non-white homeowners, and it prioritized aid to those "socially disadvantaged individuals" over white homeowners.

149. THDA developed and implemented an outreach and marketing program to advertise its Tennessee Homeowner Assistance Fund program to THDA's preferred racial and ethnic groups. This was the first step in the program's selection process—deciding who should receive information about the time-limited COVID-19 aid first and executing a strategy to reach those homeowners and generate more applications from them on the basis of race. In other words, THDA applied its preference for and prioritization of non-white homeowners in the first instance by designing and implementing a targeted outreach campaign to reach those homeowners while leaving white homeowners in the dark. This racial preference for who should be informed about the program at the earliest time and in the most direct ways erected a barrier that made obtaining funds under the Tennessee Homeowner Assistance Fund more difficult for white applicants than non-white applicants.

150. White homeowners were not targeted for outreach or marketing as part of THDA's Tennessee Homeowner Assistance Fund program and were therefore deprived of the opportunity to apply for funds on equal footing with homeowners of THDA's preferred racial and ethnic groups and were unable to obtain financial assistance.

151. Many white homeowners who could have benefited from THDA's program—like Plaintiff Jones—were intentionally omitted from THDA's targeted outreach campaign, and, as a result, had no idea that they could obtain the significant financial assistance the Tennessee Homeowner Assistance Fund program offered until it was too late to apply.

152. Had THDA not conducted its outreach and marketing efforts on the basis of race, it would have informed Tennessee homeowners about the program on a race-neutral basis. THDA would have used the money it spent on race-based targeted outreach and marketing to implement a race-neutral outreach and marketing campaign. In doing so, THDA would have had multiple options for reaching all homeowners regardless of race, including using mortgage servicers to contact all of their customers or sending direct communications to all homeowners with mortgages or within certain income ranges.

153. If THDA had conducted such race-neutral outreach and marketing, it would have informed eligible white homeowners like Plaintiff Jones about the program, and had they been informed about the program, they would have applied and obtained substantial financial assistance.

154. Moreover, THDA prioritized granting applications and distributing funds to its preferred minority homeowners over white homeowners, which included providing greater assistance with the application process to minority homeowners over white homeowners.

155. Title VI prohibits any "person" on "the ground[s] of race" from being "excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. That prohibition includes excluding a person or otherwise discriminating against them in the activity of federally funded outreach and marketing about a federally funded program providing financial assistance.

156. Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364 (holding that Small Business Administration's (SBA) distribution of Restaurant Revitalization Funds and prioritization of

"socially disadvantaged" applicants based on race failed strict scrutiny); *Holman*, 2021 WL 2877915, at *13-14 (holding that USDA's use distribution of loan forgiveness to "socially disadvantaged" applicants based on race failed strict scrutiny); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1294 (M.D. Fla. 2021) (same); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021) (same); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023) (holding that USDA's and SBA's preferential awarding of government contracts to "socially disadvantaged individuals" based on race failed strict scrutiny); *Nuziard v. Minority Bus. Dev. Agency*, 2024 WL 965299, at *40 (N.D. Tex. Mar. 5, 2024) (holding that Minority Business Development Agency's distribution of financial assistance to "socially disadvantaged" applicants based on race failed strict scrutiny); *Strickland v. U.S. Dep't of Agric.*, 2024 WL 2886574, at *9 (N.D. Tex. June 7, 2024) (holding that USDA's Emergency Relief Program's distribution of more relief funds to "socially disadvantaged farmers" than white farmers failed strict scrutiny).

157.    Indeed, courts have already held that prioritizing government aid to "socially disadvantaged individuals" based on the definitions in 13 C.F.R. § 124.103—the regulation THDA relied on in developing its own socially disadvantaged individual definition, Plan Narrative at 6—is unconstitutional. *See Vitolo*, 999 F.3d at 364; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 774.

158.    The United States Department of Justice has also recently issued a formal opinion concluding that other federal government programs are unconstitutional because they "discriminate between beneficiaries based on race . . . by awarding special benefits to individuals from 'socially disadvantaged' groups 'whose members have been subjected to racial [and] ethnic . . . prejudice.'" *Dep't of Agriculture Preferences for "Socially Disadvantaged" Groups*, 50 Op. O.L.C. __, at *1 (June 22, 2026), https://perma.cc/Z9XQ-K3KA (citation omitted). The Department of

Justice explained that "'[a]ny allocation of benefits and burdens based on a person's race is anathema' to the equal-protection guarantee of the U.S. Constitution." (citation omitted).

159.    And courts have recently held other race-based application programs to be unlawful under similar civil rights statutes. *See Fearless Fund Mgmt.*, 103 F.4th at 769, 777 (holding that private grant contest "open only to businesses owned by black women" unlawfully discriminated on the basis of race in violation of 42 U.S.C. § 1981); *Founders First Cmty.*, 2024 WL 3625684, at *1, 3-4 (holding that private small business grant program that required "applicants [to] identify as . . . Latinx, Black, Asian, Women, LGBTQIA+, a Military Veteran, or someone located in a Low to Moderate income area" unlawfully discriminated "based on race" in violation of 42 U.S.C. § 1981).

160.    Moreover, courts have held that race-based outreach, marketing, and targeting that "lead to people being treated unequally on the basis of their race" are "subject to strict scrutiny." *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13, 20-21 (D.C. Cir. 2001) (strict scrutiny applied to government "rule under which nonminorities are less likely to receive notification of job openings solely because of their race"); *Safeco Ins. Co. of Am. v. City of White House*, 191 F.3d 675, 692 (6th Cir. 1999) (citation omitted) ("[W]here 'outreach' requirements operate as a sub rosa racial preference . . . courts must apply strict scrutiny."); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 711 (9th Cir. 1997) ("The outreach the statute requires is not from all equally, or to all equally."); *Bowen Eng'g Corp. v. Vill. of Channahon*, 2003 WL 21525254, at *7 (N.D. Ill. July 2, 2003) (government action that "granted a preference to minority subcontractors who were solicited by bidders, and disadvantaged non-minority subcontractors who were not contacted and, perhaps, never learned of the subcontracting opportunities" failed strict scrutiny).

161.    Likewise, race-based outreach and marketing strategies that inform individuals of one race of opportunities while keeping individuals of another race in the dark are unlawful and injure the individuals who are not informed about the opportunities due to their race. Multiple courts have recognized this type of discrimination and injury in the Title VII employment discrimination context. Indeed, the Supreme Court recognized that "victims" of discrimination include those deterred or prevented from applying "by an employer's actual practices," including "by the manner in which he publicizes vacancies" and "his recruitment techniques." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977).

162.    Applying the Supreme Court's reasoning, lower courts have rejected arguments that "a deterred nonapplicant could never have standing to challenge an employer's discriminatory recruitment practice where that practice was so cleverly designed and so successfully implemented that it kept the nonapplicant from even knowing of the recruitment" because it "would serve to shield the thorough discriminator from Title VII liability." *United States v. City of Warren*, 759 F. Supp. 368, 372-73 (E.D. Mich. 1991); *see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 528-29 (6th Cir. 2001) (holding that individual's "injury from failing to hear about available civil service examinations or job opportunities" with city were "fairly traceable" to city's hiring practices that "arguably prevented" the individual, "a black non-resident of" the city, "from learning about available municipal positions and civil service examinations"); *Harris v. White*, 479 F. Supp. 996, 1008 (D. Mass. 1979) ("Failure to apply, moreover, will not defeat standing if the nonapplicant had no knowledge of the availability of the position because of the discriminatory recruitment practices he challenges."). Thus, courts have held that where an employer takes specific outreach and recruitment actions to inform only potential employees of a certain race—such as word-of-mouth communications and advertising in specific locations where certain races are

present, that constitutes discrimination that harms potential employees of other races who are not informed. *See, e.g.*, *United States v. Brennan*, 650 F.3d 65, 126-27 & n.62 (2d Cir. 2011) (rejecting "contention" that "allegedly discriminatory recruiting practices—word-of-mouth recruiting, and limited advertising—are not prohibited by Title VII" and stating that the "problematic employment practice is really the combination of what the employer is doing (telling white males about the job opportunity) and what the employer is not doing (not telling others)"); *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 350 (3d Cir. 1990) ("This Court has held that word-of-mouth hiring which results in a relatively small number of minority applicants is circumstantial evidence which helps to establish a reasonable inference of an employer's discriminatory treatment of blacks as a class."); *Thomas v. Wash. Cnty. Sch. Bd.*, 915 F.2d 922, 924-26 (4th Cir. 1990) (a school board violated Title VII through a combination of nepotism, word-of-mouth recruiting, and "the general practice of posting notice of vacancies only in the schools," where minorities were unlikely to see them such that some black applicants did not learn of vacancies until after they were filled).

163. The same reasoning applies when the government conducts outreach and recruitment efforts to inform individuals of certain races about federal financial assistance but not others. When the latter are unaware of the financial assistance due to the government's intentional, discriminatory outreach practices, they are injured under Title VI and the Equal Protection Clause.

164. Because THDA chose to administer its Tennessee Homeowner Assistance Fund—from the first step of outreach and marketing to the ultimate distribution of funds—on the basis of race, strict scrutiny applies.

165. THDA's race-based administration of its Tennessee Homeowner Assistance Fund program fails to satisfy strict scrutiny.

166. THDA's use of race in deciding how and to whom to inform about its program through targeted outreach efforts, whom to help with the application process, and whom to prioritize for funds does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination against a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

167. Moreover, THDA's use of race to prioritize aid to socially disadvantaged individuals over white homeowners does not remediate any specific, identified instances of past discrimination. Rather, the Tennessee Homeowner Assistance Fund program is based on a generalized notion of remedying past societal discrimination for homeowners of its preferred racial and ethnic groups, declaring homeowners socially disadvantaged individuals if they are "member[s] of a minority race or ethnicity." Plan Narrative at 6. In other words, the program is not targeted toward some specific episode of past, intentional discrimination that the THDA participated in.

168. Even if THDA could show a compelling interest in its race-based Tennessee Homeowner Assistance Fund program, the program is not narrowly tailored.

169. *First*, THDA failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without prioritizing aid on the basis of race, including in both outreach and marketing about their programs and review of applications.

170. For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and prioritized applications from those homeowners. Tex. Dep't of Hous. and Cmty. Aff., Texas Homeowner Assistance Fund (HAF) at 11-12 (Jan. 27, 2022), https://perma.cc/2QU3-2TEK ("Texas HAF Plan").

171.     California, too, used race-neutral criteria to prioritize aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and prioritized applications from those homeowners. Cal. Hous. Fin. Agency, California Homeowner Assistance Fund Plan at 10-11 (Dec. 9, 2021), https://perma.cc/5VAR-9DEH ("California HAF Plan"). As defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." Office of Policy Development and Research (PD&R), Qualified Census Tracts and Difficult Development Areas, HUD User, https://perma.cc/C9XW-R4JF ("HUD, Qualified Census Tracts and Difficult Development Areas"). As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA Ctr. for Neighborhood Knowledge, California COVID-19 Owner Vulnerability, https://perma.cc/W49X-H8J2 ("UCLA, California COVID-19 Owner Vulnerability").

172.     THDA could have also defined socially disadvantaged individual status based on race-neutral factors such as geographic location, family size, risk of eviction, mortgage debt, or countless others and used those factors to prioritize applications. Indeed, under THDA's tiered socially disadvantaged definition, it could have simply used the last race-neutral factor for all ap-

plicants—"the individual's county of residence is one that has been deemed to have 'persistent poverty.'" Plan Narrative at 6. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

173.    *Second*, THDA's prioritizing socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that THDA's preferred minority home-owners are disadvantaged while white homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. In other words, THDA decided it was important for homeowners of certain racial groups be specifically informed about the program and be helped through the application process in order to prioritize aid to those homeowners rather than to home-owners who are members of disfavored races. And in the context of distributing federal benefits, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. THDA's program has "finite resources," which means that any prioritization makes a big difference. At the first step of the program, THDA intentionally informed socially disadvantaged individuals based on their race so that they would have earlier and easier opportunity to learn about the program and apply for funds than white homeowners. Homeowners who were not informed about the program by THDA (or who heard about it too late) risk having these crucial funds delayed or obtaining no relief at all when the funds are exhausted. In reviewing applications and distributing funds, applicants who qualify as socially disadvantaged individuals based on their race have earlier and easier access to funds than appli-cants who do not meet the racial criteria while applicants at the back of the line risk having crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuziard*, 2024 WL 965299 at \*36 ("[T]he fact that the latter applicants have a backdoor to benefits doesn't change the initial disadvantage conferred by the stereotype."); *see SFFA*, 600 U.S. at 219 ("How else but 'negative'

can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?").

174. *Third*, THDA's Tennessee Homeowner Assistance Fund program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by prioritizing aid to homeowners based on race. For one, it is underinclusive—the program excludes minority homeowners who do not fall within its income limits and white homeowners who do fall within its income limits even if those white homeowners experienced discrimination. The program is also underinclusive in that it prioritizes assistance to certain preferred minority racial and ethnic groups, Plan Narrative at 6, but it is not clear if those groups include other minorities who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. It is also overinclusive—THDA prioritized outreach and application assistance and review for non-white homeowners regardless of whether those homeowners or their specific racial group have experienced housing discrimination.

175. Because THDA's intentional use of race in administering the Tennessee Homeowner Assistance Fund program fails strict scrutiny, THDA's actions violate the Equal Protection Clause and Title VI.

176. Plaintiff and other Class members have suffered damages as a direct and proximate result of THDA's violations of Title VI. Specifically, Plaintiff and other Class members were "excluded from participation in," "denied the benefits of," and were "subjected to discrimination under" the Tennessee Homeowner Assistance Fund in violation of Title VI because of the unequal treatment they suffered as a result of THDA's race-based actions. 42 U.S.C. § 2000d. Therefore, Plaintiff and other Class members are entitled to substantial compensatory damages, to be meas-

ured at trial, for any and all THDA funds that they have been wrongfully deprived of because of their race.

177.     Plaintiff and other Class members are also entitled to nominal damages for THDA's completed violation of their legal rights under the Equal Protection Clause and Title VI.

178.     Plaintiff and other Class members are also entitled to declaratory and injunctive relief, declaring that THDA's Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring THDA to stop administering the program in a racially discriminatory manner.

179.     In the alternative, Plaintiff and other Class members are entitled to declaratory and injunctive relief, declaring that THDA's Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring THDA to reopen the program to all forms of mortgage assistance, conduct outreach and marketing about the program on a race-neutral basis, and reconsider denied applications and consider new applications on a race-neutral basis.

180.     Plaintiff is also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Plaintiff requests relief and judgment as follows:

a.   Certify that this action is a proper class action under Federal Rule of Civil Procedure 23(a) and (b) on behalf of the Class defined herein;

b.   Award Plaintiff and the Class members compensatory damages for Defendants' violation of Title VI, in an amount to be proven at trial, including interest thereon;

c.   Award Plaintiff and the Class members nominal damages for Defendants' completed violation of Title VI and the Equal Protection Clause;

d.   Declare that Defendants' racially discriminatory development, marketing, and administration of the Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner.

e.   Alternatively, declare that Defendants' racially discriminatory development, marketing, and administration of its Tennessee Homeowner Assistance Fund program violates

Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner, reopen the program to all forms of mortgage assistance, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis;

f. Enter judgment in favor of Plaintiff and the Class members;

g. Award Plaintiff attorneys' fees and costs under 42 U.S.C. § 1988; and

h. Order such further relief as the Court may deem proper and just.

Dated: July 1, 2026

Respectfully submitted,

s/ Paul J. Krog

Jonathan F. Cohn*
2972578 (NY)
Lehotsky Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
jon@lehotskycohn.com

Paul J. Krog
Bulso PLC
155 Franklin Road Suite 400
Brentwood, TN 37027
(615) 913-5130
pkrog@bulso.com

William T. Thompson*
24088531 (TX)
Lehotsky Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lehotskycohn.com

Jared B. Magnuson*
131189 (GA)
Lehotsky Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lehotskycohn.com

Mark M. Rothrock*
56747 (NC)
Lehotsky Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lehotskycohn.com

*Pro Hac Vice Application Forthcoming

Attorneys for Plaintiff